IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

HENRY JONES
*Defendant*.

Criminal Action No.  ELH-22-0371

**MEMORANDUM OPINION**

Defendant Henry Jones is charged with the offense of possession of ammunition by a prohibited person, in violation of 18 U.S.C. § 922(g).  ECF 1.  The charge stems from the recovery of a firearm found in defendant's satchel, which was searched by an officer of the Baltimore Police Department ("BPD"), without a warrant, after the officer removed the bag from defendant's body. Although the parties dispute the exact location of the search of the bag, it is undisputed that the search occurred while defendant sat on the steps of the porch of an attached home, with his hands handcuffed behind his back, surrounded by several BPD officers.  Jones claims that, at the time, he was visiting the niece of the home's owner, with permission of the owner.

Jones has filed a "Motion to Suppress Evidence" (ECF 33), as well as a "Motion to Suppress Statements" (ECF 34), claiming violations of the Fourth, Fifth, and Sixth Amendments to the Constitution.  The government opposes the motions.  ECF 38 (the "Opposition").  And, defendant has replied.  ECF 41 (the "Reply").

The Court held motions hearings on June 26, 2023, and June 27, 2023, at which evidence was presented.  ECF 45.  This included footage from BPD's closed circuit television system ("CCTV") and BPD body-worn cameras.

For the reasons that follow, I shall grant defendant's motions.  ECF 33; ECF 34.

## I. Factual Background[1]

Beginning on May 23, 2022, Special Agent ("S.A.") Ryan Welsh of the Drug Enforcement Administration ("DEA") began conducting real-time surveillance of the 1200-1300 block of Poplar Grove Street in Baltimore City, using the CCTV. The area is regarded as a high crime area, where multiple homicides and non-fatal shootings have occurred, along with extensive drug distribution. ECF 38 at 3. S.A. Welsh was familiar with the crime issues in the area. Moreover, he stated that the defendant had come to the attention of the DEA, and he was aware that defendant had a prior criminal record and was not legally allowed to possess a firearm.

S.A. Welsh testified that he saw defendant with a gun on May 23, 2022, while defendant was at 1221 Poplar Grove Street (the "Residence"). S.A. Welsh believed that the Residence was a "stash house" for drugs, frequented by suspected drug traffickers. Agent Welsh saw defendant hand a gun to another person who was a suspected drug dealer. He reported the information to BPD Sergeant Flynn, who was part of the BPD Group Violence Unit. But, because the firearm could not be located, no one was arrested on that date.

The next day, May 24, 2022, at about 4:00 p.m., S.A. Welsh was again conducting real-time surveillance of the same area, using the CCTV. He again saw the defendant at 1221 Poplar Grove Street. At the time, defendant was wearing a cross-body black satchel, which was attached to his body by a strap that he wore across his chest and over his shoulder. *Id.*

S.A. Welsh testified that he has had significant training on firearms and has made more than 100 gun arrests. At 4:03 p.m. on May 24, 2022, S.A. Welsh observed "the outline of a L

---

[1] The factual background is drawn from the evidence presented at the motions hearing and the parties' briefing. Unfortunately, the Court does not have a transcript from the Motions hearing. Therefore, I have relied on my notes. To the extent that I use quotes of the testimony, I do not represent that they are precisely correct.

shape object" in defendant's front sweatshirt pocket.  Based on his training, S.A. Welsh believed the item was a handgun.  Indeed, S.A. Welsh claimed that when he saw the "bulge" in defendant's front pocket, it was "pretty obvious" that it was a gun.

Agent Welsh also explained that the term "security check" describes an armed individual's action of checking to make sure an unholstered firearm is secure.  *See also* ECF 38 at 5 n.1; ECF 33-1 at 1.  While Agent Welsh was observing defendant on the CCTV, he saw defendant conduct security checks of a weapon.  According to an Incident Report (ECF 33-1) prepared by Detective Rafael Paredes, the primary BPD officer who later responded to the Residence, defendant touched the object twice, once at about 4:08 p.m. and again at 4:12 p.m.  *Id.* at 1.

Government Exhibit 1 contains CCTV footage that captured what S.A. Welsh observed, including an instant when an L shape of an object is plainly visible in defendant's front pocket.  In addition, the government introduced as government's exhibits 2 and 3 the following screenshots of the CCTV footage:[2]

---

[2] The outline of the gun, albeit brief, is more apparent in the video than in these photographs.





        While S.A. Welsh was conducting CCTV surveillance of Jones, defendant left the Residence, crossed the street, and entered Winchester Famous Deli, located at 1300 Poplar Grove. As defendant was entering the store, he unzipped the black satchel.  According to S.A. Welsh, Jones was with a person who seemed to be serving as a lookout.

S.A. Welsh could not see what took place while defendant was inside the store.  But, when defendant exited the store at about 4:15 p.m., S.A. Welsh could no longer see the outline of an object inside defendant's sweatshirt pocket.  *See* ECF 33-1 at 1.  However, S.A. Welsh thought the satchel looked heavier, and he noted that it was hanging lower on defendant's body and seemed thicker.  Therefore, S.A. Welsh believed that, while defendant was in the store, he transferred the handgun from his sweatshirt to his satchel.  *Id.*  S.A. Welsh contacted Sergeant Flynn to provide him with an update.

After Jones left the store, he returned to the Residence.  While there, he socialized with people on the porch or in the vicinity of the Residence, including the homeowner's niece.  *See* ECF 41 at 7.

At 4:41 p.m., Detective Mitchell Ramsey and Detective Alex Rodriguez-Ramos ("Rodriguez")[3] arrived at the Residence and approached the front porch, with their guns drawn.  Jones was alone on the porch.  Ramsey ordered Jones to put his hands in the air.  Then, Rodriguez removed defendant's cross-body satchel.  Defendant was promptly handcuffed, with his hands behind his back.  However, Detective Ramsey told defendant that he was "not under arrest" and was "just being detained."  *See* ECF 33 at 3.

Soon, a total of six police officers were at the Residence.  Eventually, there were seven officers at the scene.

BPD officers moved the defendant to the steps of the front porch of the Residence and sat him down.  Defendant was compliant.  While defendant was sitting on the porch steps, which are adjacent to the sidewalk, he remained handcuffed, with his hands behind his back.  Three officers

---

[3] In his motion to suppress evidence, defendant refers to Rodriguez as a detective (*see* ECF 33), while the government refers to Rodriguez as an officer.  *See* ECF 38.  At the motions hearing, Rodriguez testified that he is a Detective.

surrounded the defendant and, from time to time, Officer Ortiz seemed to have his hand on defendant's shoulder.  *Id.*

Detective Rodriguez recalled that BPD officers had been told that the suspect was possibly armed and had prior incidents of resisting arrest.  Moreover, they were initially told that the weapon was in the suspect's jacket pocket, but later they were told it was possibly in the suspect's satchel.

Rodriguez explained that he removed the satchel from defendant as a precautionary measure, because of information that it contained a gun, and he did so both for police and public safety, before the defendant was handcuffed.  He described the satchel as a bag made of cloth, not leather; thin material; and it looked as if it contained more than just water and a cell phone.  In Rodriguez's view, it was weighed down, as if it contained a firearm.

The Incident Report (ECF 33-1) states that Rodriguez "conducted a weapon pat-down of the black satchel" at 4:43 p.m. – two minutes after BPD officers restrained defendant and took the satchel off his body.  *Id.* at 1.  Rodriguez stated that he began to feel the bag, and he felt what he knew was the handle of a handgun.  He was about three to four feet from Jones at the time.  He then stated "10-4," meaning that there was a gun in the bag.  Officer Shelley provided Rodriguez with blue gloves, which would be used if Rodriguez were to touch the weapon.

According to the government, Rodriguez's conduct of feeling the bag constituted a search.  And, according to the government, it was lawful because it was a search incident to arrest, and it occurred in close proximity to the defendant.[4]

---

[4] If the search occurred when Rodriguez felt the bag, defendant was in close proximity to the officer.  However, Rodriguez easily could have walked to another location with the bag.  Indeed, the camera footage shows that Rodriguez held the satchel in one hand, with no apparent difficulty.  *Cf. King*, 563 U.S. at 462 (ruling that the exigent circumstances exception is not available where police "create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment").

After Rodriguez felt the gun handle, he took the satchel to the trunk of his police vehicle, which was parked in the street, some fifteen to twenty feet away from defendant.  He explained that there was "no reason" to open the bag while on the sidewalk.  At 4:44 p.m., Rodriguez opened the bag and recovered a Polymer80 semi-automatic handgun.  The weapon was loaded with eight rounds of ammunition.  In addition, he recovered a small quantity of suspected drugs.  *See* ECF 33-1 at 2.  Rodriguez then rendered the weapon safe and put it in a lock box in his police car.

In defendant's Reply, he submitted the following screenshot of body-worn camera footage depicting the scene at the police vehicle, when Rodriguez opened the satchel.  *See* ECF 41 at 7. The screenshot was not submitted into evidence as an exhibit.  *See* ECF 67.  However, the screenshot comes from body-worn camera footage that was submitted into evidence as government's Exhibit 1.



In his suppression motion, defendant describes the above screenshot, as follows, ECF 41 at 7:

> Officer Rodriguez is in the far left, standing in the street while he opens the satchel. Mr. Jones is handcuffed with his hands behind his back, and he is sitting on the steps of the home's front porch.   Mr. Jones is hardly visible from Officer Rodriguez's vantage point, as Mr. Jones is completely surrounded by three officers guarding him, one of whom grips Mr. Jones's shoulder.

After the satchel was opened, Rodriguez reported that he found a gun, again stating "10-4." And, Rodriguez asked Detective Ramsey, "Did Madison call you?" Rodriguez explained that this was their code to signal the recovery of a gun.

According to Rodriguez, if the BPD takes custody of a person, BPD officers would conduct a search of the person for safety reasons.   After the gun was recovered, the police searched the defendant.   And, some $2,000 in U.S. currency was found in defendant's pants pocket.

Moreover, Rodriguez testified that BPD policy requires that, if a suspect is taken into custody, the police must conduct an inventory search of the suspect's possessions, such as the satchel.   This is for officer safety and to avoid a suspect's claim of theft of property.   Although Rodriguez stated that BPD has a written policy for inventory searches, no written policy was introduced into evidence.   Nor did Rodriguez identify a particular policy that requires an inventory search under the circumstances attendant here.   And, the property sheets do not mention the recovery of defendant's keys, which were attached to or in the satchel.

Detective Ramsey described the Poplar Grove area in question as an "open air drug market" that is marked by violence. He stated that the BPD does not have a "standalone policy" for conducting an inventory of a suspect's personal items at the scene.   But, he explained that personal items should be inventoried and documented.

Ramsey recalled that after Detective Rodriguez announced the recovery of a gun, Ramsey advised Jones of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). This occurred at about 4:45 p.m.

Defendant asserts that, "[w]hile in handcuffs at the scene of his arrest, and surrounded by several members of BPD, law enforcement officers asked [him] questions related to his arrest without first advising him of his *Miranda* rights." ECF 34 at 1. Defendant also states that BPD officers later advised him of his *Miranda* rights, but they "failed to ask him whether he waived those rights before continuing to ask him questions." *Id.* But, the parties did not specify any particular statements provided by defendant.

Officer Justin Oliva subsequently transported defendant to the police station. During the transport, defendant made statements indicating that he had the gun for his protection. *Id.*

Detective Rafael Paredes testified that he was the primary officer at the scene. He believed that, upon arrival at the Residence, the officers were performing an arrest, based on S.A. Welsh's information, and that they had probable cause to do so. He also explained that the police would not have searched the satchel while the defendant was wearing it, for safety reasons.

Laberia Henderson has been a friend of the defendant since high school. She has known him for about 18 years.

Ms. Henderson testified that the Residence is the home of her elderly and disabled aunt, with whom Ms. Henderson previously lived. Although Ms. Henderson moved out of the Residence about seven or eight years ago, she visits her aunt every day. Moreover, she claimed that defendant visits her aunt several times a week and runs errands for her. And, she testified that defendant has her aunt's permission to be at the Residence.

On cross-examination, the government attempted to undermine Ms. Henderson's credibility. It is clear that the two are friends, as evident from their socializing, captured by the CCTV. And, the CCTV footage does not suggest that Ms. Henderson had any objection to defendant's presence at the Residence.

Additional facts are discussed, *infra*.

## II. The Contentions[5]

Defendant challenges the warrantless entry onto the front porch of the Residence; the warrantless seizure of defendant and his satchel; and the warrantless search of defendant's satchel while he was restrained and no longer had access to it. ECF 33 at 1. He argues that these actions violated his Fourth Amendment rights, and therefore the Court should suppress all direct and derivative evidence as a result. *Id.*

In particular, Jones asserts that BPD officers did not have either probable cause or reasonable, articulable suspicion to seize him because they did not observe him with a firearm, nor did they know whether he could lawfully possess a firearm when they seized him. ECF 33 at 4-8. But, even if probable cause or reasonable suspicion existed to seize defendant, he argues that the warrantless search of his satchel was nonetheless unlawful because he no longer had access to the satchel when it was searched. ECF 33 at 8-13.

Further, defendant maintains that the BPD did not intend to arrest Jones when they first entered the porch, as reflected in their statements to Jones, telling him he was not under arrest. It was only when the gun was found that BPD intended to arrest defendant, as supported by the

---

[5] "Motions to suppress fall into the class of issues that are decided by the court and not the jury." *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005) (citing Fed. R. Crim. P. 12(b)(3)(C), 12(d); Fed. R. Evid. 104(a)). "In deciding a motion to suppress, the district court is empowered to make findings of fact, and conclusions of law." *United States v. Adkinson*, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citing *Stevenson*, 396 F.3d at 541).

timing of Detective Ramsey's advisement of rights.  Therefore, he contends that BPD cannot rely on the search incident to arrest doctrine to uphold the search of the satchel.

Defendant also disputes the government's claim that the police would have inevitably discovered the gun.  In this regard, Jones argues that BPD officers would not have arrested him if they had not searched the satchel.  ECF 41 at 13-14.  Additionally, defendant contends that the inventory search exception does not apply because the officers had an investigatory purpose for searching the satchel.  *Id*. at 14-16.

In addition, Jones claims that the BPD officers' warrantless entry on the porch of the Residence constituted an unlawful search of the curtilage of the Residence.  And, he insists that he has standing to challenge the entry as a social guest, and asserts that the entry was not based on exigent circumstances.  *Id*. at 14-20.

As to any statements made by defendant, he argues: "Any and all statements, admissions, or confessions were obtained in violation of Mr. Jones's privilege against self-incrimination, his right to counsel as guaranteed by the Fifth and Sixth Amendments to the United States Constitution, the Supreme Court's holding in *Miranda v. Arizona*, 384 U.S. 436 (1966), and were otherwise involuntary."  ECF 34 at 1-2.  Further, defendant claims that his statements "must be suppressed because they were the direct result of law enforcement officers' unlawful and warrantless actions in this case, which are the subject of his Motion to Suppress Evidence."  ECF 34 at 2.

The government counters that BPD officers had probable cause to arrest Jones upon arrival at the Residence, because S.A. Welsh saw the clear outline of a gun in the front pocket of defendant's sweatshirt, knew of defendant's criminal history, and knew he was not legally

permitted to possess a weapon.[6]   His knowledge was imputed to the officers on the scene, according to the government.  And, the government contends that the search of the satchel occurred when Rodriguez felt the bag, which occurred when Rodriguez was in close proximity to the defendant.

According to the government, when Rodriguez felt the contents of the satchel, it was a lawful search incident to arrest, based on probable cause, and while defendant was within reach of the satchel.  It was then that Rodriguez determined the satchel contained a firearm.  However, the government explains that, for safety reasons, the officer did not open the bag at that location. Instead, Rodriguez took the satchel to the police vehicle, so that it could be opened safely.

Further, the government argues that when BPD officers take possession of an arrestee's personal effects, they must conduct an inventory.  Therefore, the government argues that, even if the search was improper, the inevitable discovery doctrine applies.

In addition, the government insists that defendant has no standing to complain about the warrantless entry onto the porch.  But, in any event, the government argues that the entry was lawful because it was based on exigent circumstances.  Moreover, the government maintains that Jones's Fifth Amendment rights were not violated.  *See* ECF 38 at 22.  Notably, the government does not argue that defendant's statements should be allowed regardless of whether his rights under the Fourth Amendment were violated.

---

[6] Because defendant made the motions, I have presented defendant's arguments first.  But, the government has the burden to establish the legality of the search.  *See*, *e.g.*, *United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013).

### III. Motion to Suppress Evidence

### A. The Warrantless Seizure of Defendant:  An Arrest or a Detention?

The Fourth Amendment to the Constitution guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."

The Fourth Amendment protects against unreasonable searches and seizures.  *See Utah v. Strieff*, 579 U.S. 232, 236 (2016); *United States v. Mendenhall*, 446 U.S. 544, 551 (1980).  This protection extends to brief investigatory stops.  *United States v. Cloud*, 994 F.3d 233, 237 (4th Cir. 2021); *United States v. Drakeford*, 992 F.3d 255, 259 (4th Cir. 2021); *United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020) (en banc).  By its plain text, however, the Fourth Amendment "does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *see Illinois v. Rodriguez,* 497 U.S. 177, 183-84 (1990); *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *Mendenhall*, 446 U.S. at 551.  Thus, "'the ultimate touchstone of the Fourth Amendment is reasonableness.'"  *Riley v. California*, 573 U.S. 373, 381 (2014) (citation and some quotation marks omitted); *see also Fernandez v. Calif.*, 571 U.S. 292, 298 (2014); *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *Maryland v. Wilson*, 519 U.S. 408, 411 (1997); *Jimeno*, 500 U.S. at 250.

The "test of reasonableness under the Fourth Amendment is an objective one."  *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  Reasonableness is determined by balancing "the intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests."  *Maryland v. Buie*, 494 U.S. 325, 331 (1990).  As the Supreme Court explained in *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam): "Reasonableness, of course, depends 'on a balance between the public

interest and the individual's right to personal security free from arbitrary interference by law officers.'" (Quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)); *see United States v. Sokolow*, 490 U.S. 1, 9 (1989); *see also United States v. Lyles*, 910 F.3d 787, 796 (4th Cir. 2018) ("The magnitude of the intrusion relative to the seriousness of any offense 'is of central relevance to determining reasonableness[.]'") (quoting *Maryland v. King*, 569 U.S. 435, 446 (2013)).

In *Santos v. Frederick County Bd. of Com'rs*, 725 F.3d 451 (4th Cir. 2013), the Fourth Circuit summarized "three categories of police-citizen encounters," *id.* at 460-61:

> First, "consensual" encounters, the least intrusive type of police-citizen interaction, do not constitute seizures and, therefore, do not implicate Fourth Amendment protections. *Florida v. Bostick*, 501 U.S. 429, 434[] (1991). Second, brief investigative detentions—commonly referred to as "*Terry* stops"—require reasonable, articulable suspicion of criminal activity. *Terry* [*v. Ohio*, 392 U.S. 1, 21 (1968)]. Finally, arrests, the most intrusive type of police-citizen encounter, must be supported by probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 152[] (2006).
>
> A police-citizen encounter rises to the level of a Fourth Amendment seizure when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (quoting *Terry*, 392 U.S. at 19 n.16 [ ]). This inquiry is objective, [*United States v.*] *Weaver*, 282 F.3d [302, 309 (4th Cir. 2002)], asking whether "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Jones*, 678 F.3d at 299 (quoting *Mendenhall*, 446 U.S. at 553 [ ]). An encounter generally remains consensual when, for example, police officers engage an individual in routine questioning in a public place. *United States v. Gray*, 883 F.2d 320, 323 (1989); *see also Bostick*, 501 U.S. at 434[ ] ("[M]ere police questioning does not constitute a seizure.").

For purposes of the Fourth Amendment, a seizure occurs "when the officer, 'by means of physical force or show of authority,' terminates or restrains [the suspect's] freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (citations and some quotation marks omitted). In *Torres v. Madrid,* ___ U.S. ___, 141 S. Ct. 989, 995 (2021), the Supreme Court said: "The application of physical force to the body of a person with intent to restrain is a seizure . . . ." And,

the Court added, *id.* at 996: "The 'seizure' of a 'person' plainly refers to an arrest."  The *Torres*

Court cited *California v. Hodari D.*, 499 U.S. 621, 624 (1991), for the proposition that an arrest is

the application of physical force with the intent to restrain.  *See Torres*, 141 S. Ct. at 995; *see also*

*Cloud*, 994 F.3d at 241.

As to a show of authority, "a person has been seized within the meaning of the Fourth

Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person

would have believed that he was not free to leave."  *Mendenhall*, 446 U.S. at 554-55; *see Michigan*

*v. Chesternut*, 486 U.S. 567, 573 (1988).  To determine if a reasonable person would feel free to

leave, courts consider the totality of the circumstances, "measured objectively" from the

"perspective" of a reasonable person.  *Cloud*, 994 F.3d at 242.  But, a show of authority "does not

become an arrest unless and until the arrestee complies with the demand."  *Torres*, 141 S. Ct. at

995; *see Hodari D.*, 499 U.S. at 626.

Notably, "the subjective views of a police officer who effects a detention have no bearing

on whether that detention constitutes an arrest."  *United States v. Elston*, 479 F.3d 314, 319 (4th

Cir. 2007).  And, of relevance here, the Fourth Circuit has said that "[a] brief but complete

restriction of liberty" is not necessarily an arrest.  *Id.*

The factors relevant to the analysis include the number of police officers at the scene;

whether they are in uniform; whether the police displayed weapons; whether they touched the

defendant or attempted to restrain his movement; tone of voice; whether the officer informed the

defendant that he was suspected of illegal activity; and whether any requested identification was

promptly returned.  *United States v. Black,* 707 F.3d 531, 537-38 (4th Cir. 2013).  Yet, the Fourth

Circuit has also "recognized that 'drawing weapons, handcuffing a suspect, placing a suspect in a

patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful

stop into a custodial arrest.'"  *Elston*, 479 F.3d at 320 (citing *United States v. Leshuk*, 65 F.3d 1105, 1109-110 (4th Cir. 1995)).

In *Elston*, 479 F.3d at 320, for example, the police reasonably suspected that the defendant was armed and dangerous.  The Court found that the police made a lawful *Terry* stop, not an arrest, despite the fact that weapons were drawn and the defendant was handcuffed.  *See Terry v. Ohio*, 392 U.S. 1 (1968).  Among other things, the Fourth Circuit observed that the stop lasted no longer than necessary to verify the officer's suspicion.  *Elston*, 479 F.3d at 320.

There is no question here that Jones was seized within the meaning of the Fourth Amendment when Detectives Rodriguez and Ramsey entered the porch of the Residence.  But, the question of whether the seizure was an arrest or, instead, a detention, is a close one.

In his suppression motion, defendant contends that he "was under arrest by the time police restrained him by his wrists", which curtailed his "freedom to a degree associated with formal arrest."  ECF 33 at 4.  Similarly, the government states that it was "reasonable for officers to remove the cross-body satchel from Jones's person . . . while simultaneously arresting Jones and searching the crossbody satchel strapped across his person."  ECF 38 at 13.  Thus, the parties seem to agree that defendant was arrested when Detectives Rodriguez and Ramsey entered the porch, with guns drawn, and placed Jones in handcuffs, notwithstanding that they told Jones that he was not under arrest.

The two police officers restrained Jones as they investigated.  Other officers quickly arrived at the scene.  Defendant was moved to the porch steps, and he complied with the show of force.  Three officers surrounded him.  A reasonable person would not have believed he was free to leave.  And, the seizure was not especially short in duration.

As I see it, the seizure appears closer to an arrest than to a mere detention.

16

**B.  Was the Seizure of Defendant Based on Probable Cause or Reasonable Suspicion?**

A warrantless arrest, and a search incident thereto, are permitted where there is probable cause to believe a felony is being or has been committed by the arrested individual.  *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983); *see also United States v. Watson*, 423 U.S. 411, 424 (1976) (holding that warrantless arrests are permitted if an officer has probable cause to believe a felony has been committed, even if committed outside the officer's presence).  However, "the officer's reasonable ground for belief of guilt 'must be particularized with respect to the person to be searched or seized.'"  *Davis v. Prince George's Cty.*, *Md.*, 348 F. App'x 842, 848-49 (4th Cir. 2009) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).  And, "[t]he government bears the burden of proof in justifying a warrantless search or seizure."  *McGee*, 736 F.3d at 269; *see also United States v. Gwinn*, 219 F.3d 316, 335 (4th Cir. 2000).

"Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  *Gates*, 462 U.S. at 232; *see also Pringle*, 540 U.S. at 370 (describing probable cause as "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life").  Although probable cause requires less than the standard of evidence needed to convict, it requires more than "bare suspicion."  *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998); *see also United States v. Humphries*, 372 F.3d 653, 660 (4th Cir. 2004) ("[T]he probable-cause standard does not require that the officer's belief be more likely true than false.").

"Although the concept of probable cause defies a precise definition, it exists where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found in the place to be searched."  *United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010) (quoting *Ornelas v. United States*, 517 U.S. 690,

696 (1996)) (internal quotation marks omitted).  "Because probable cause is an objective test, [the Fourth Circuit] examine[s] the facts within the knowledge of arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act; [the Fourth Circuit] do[es] not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause."  *Gray*, 137 F.3d at 769.

Of relevance, probable cause may be established through the "collective knowledge doctrine."  *United States v. Massenburg*, 654 F.3d 480, 494 (4th Cir. 2011).  The "collective-knowledge doctrine simply directs [a court] to substitute the knowledge of the instructing officer or officers for the knowledge of the acting officer."  *Id*. at 493; *see also United States v. Laughman*, 618 F.2d 1067, 1072–73 (4th Cir. 1980) ("The law seems to be clear that so long as the officer who orders an arrest or search has knowledge of facts establishing probable cause, it is not necessary for the officers actually making the arrest or conducting the search to be personally aware of those facts.").

The evidence reflects that S.A. Welsh and other BPD officers knew that defendant has a felony record.  The government argues that, because defendant is a convicted felon, his possession of a firearm was in violation of Md. Code (2022 Repl. Vol.), § 5-133(c) of the Public Safety Article ("P.S.") and 18 U.S.C. § 922(g).  ECF 38 at 8.  These statutes prohibit a felon from possessing a firearm.[7]

---

[7] In *New York State Rifle & Pistol Association, Inc. v. Bruen*, ___ U.S. ___, 142 S. Ct. 2111 (2022), the Supreme Court put in place a new test to govern firearm regulations, which has resulted in a host of Second Amendment challenges.  For instance, the Fifth Circuit recently held that 18 U.S.C. § 922(g)(8), which prohibits possession of a firearm by individuals subject to a Domestic Abuse Court Order, "falls outside the class of firearm regulations countenanced by the Second Amendment."  *United States v. Rahimi*, 59 F.4th 163 (2023), *cert. granted*, ___ S. Ct. ___, 2023 WL 4278450 (June 30, 2023).

S.A. Welsh testified credibly that he has had training as to firearms, and he stated that he observed the outline of a firearm in defendant's sweatshirt pocket.  He also saw defendant perform "security checks" as to the weapon, and knew that defendant was prohibited from possessing a firearm, based on his prior criminal record.  *Id*.  Therefore, the government contends that, based on the observations of S.A. Welsh, who was monitoring CCTV footage, BPD had probable cause to arrest Jones when they entered the porch, and to do so without a warrant.

Of course, not every "bulge" can justify a seizure.  *See, e.g*., *Floyd v. City of New York*, 959 F. Supp. 2d 540, 614 (S.D.N.Y. 2013) ("[T]he outline of a commonly carried object such as a wallet or cell phone does not justify a stop or frisk.").  But, the evidence here was not about a mere bulge.  To be sure, the screenshots introduced in evidence show a pointy object protruding from defendant's sweatshirt, which could have been the corner of a wallet or a cellphone.  But, S.A. Welsh, a trained law enforcement officer who has experience with firearms, was confident that the object that he saw was a gun.  Moreover, the body-worn camera footage plainly, albeit briefly, captures what appears to be the outline of a gun in the defendant's hoodie pocket.

When defendant approached the corner store, S.A. Welsh saw him unzip the satchel.  S.A. Welsh was not able to see what happened inside the store.  When defendant exited the store, the outline of the gun, seen earlier in Jones's front pocket, was no longer visible.  S.A. Welsh thought the satchel looked weighted down, and he speculated that defendant "possibly transferred the weapon from his front hoodie pocket to the black in color satchel."  ECF 33-1 at 1.

The belief that defendant transferred the gun from his sweatshirt pocket to the satchel was little more than an educated guess.  Just the day before, on May 23, 2022, defendant was seen transferring a gun to another person.  He easily could have done the same while in the store on

May 24, 2022.  So, at the time of the BPD entry onto the porch of the Residence, there was no probable cause to believe that defendant was, *at that particular instance*, in possession of a firearm.

But, that is of no legal significance.  If Agent Welsh had probable cause to believe that defendant was unlawfully in possession of a gun when he entered the store, then the probable cause would not evaporate merely because defendant may have transferred the firearm to someone else while in the store.  The validity of the warrantless arrest does not require probable cause to believe that defendant unlawfully possessed the firearm at the moment of the arrest.  As noted earlier, if the police have probable cause to believe a felony has been committed by an individual, the police may effectuate a warrantless arrest of that individual.  *Gates*, 462 U.S. at 230-31.

In my view, based on the testimony of S.A. Welsh, which I reviewed earlier, the BPD had probable cause to arrest defendant on May 24, 2022, for the offense of unlawful possession of a firearm.

The government argues, alternatively, that defendant's seizure was supported by reasonable, articulable suspicion.  *See* ECF 38 at 8-10.   That standard is easily met.

The seminal case of *Terry v. Ohio*, 392 U.S. 1, 30 (1968), and its progeny, permit a police officer to stop and temporarily detain an individual, for investigative purposes, without violation of the Fourth Amendment's warrant requirement or the prohibition against unreasonable searches and seizures, so long as there is reasonable, articulable suspicion, based on specific facts, that criminal activity is afoot.  *See also United States v. Socumb*, 804 F.3d 677, 681 (4th Cir. 2015).

In *Terry*, 392 U.S. 1, and the companion case of *Sibron v. New York*, 392 U.S. 40 (1968), the Supreme Court ruled that police officers may stop a person when they have "specific and articulable facts which, taken together with rational inferences from those facts," create reasonable suspicion that the person has been or is about to engage in criminal activity.  *Terry*, 392 U.S. at

21; *see United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Sokolow*, 490 U.S. at 7 ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause . . . ."); *see also United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019).

The purpose of a *Terry* stop is investigative—to verify or to dispel the officer's suspicion surrounding the suspect.  *Terry*, 392 U.S. at 22-23, 30.  When an officer has a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,'" the officer may ordinarily detain an individual for a brief period of time.  *Sokolow*, 490 U.S. at 2 (quoting *Terry*, 392 U.S. at 30).  But, it is well settled that the stop must be "justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."  *United States v. Cortez*, 449 U.S. 411, 417 (1981).  In other words, even a "brief" investigatory stop "must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity."  *Reid v. Georgia*, 448 U.S. 438, 440 (1980); *see also Arvizu*, 434 U.S. at 273; *United States v. Bumpers*, 705 F.3d 168, 171 (4th Cir. 2013); *Massenburg*, 654 F.3d at 485; *United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011).

Reasonable, articulable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity. . . ."  *Ornelas*, 517 U.S. at 696; *see Kansas v. Glover*, ___ U.S. ___, 140 S. Ct. 1183, 1188 (2020); *Navarette v. California,* 572 U.S. 393, 396-97 (2014); *United States v. Feliciana*, 974 F.3d 519, 523 (4th Cir. 2020); *United States v. Gardner*, 823 F.3d 793, 799 (4th Cir. 2016); *United States v. Williams*, 808 F.3d 238, 246 (4th Cir. 2015); *United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2014) .  As the Supreme Court said in *Terry*, 392 U.S. at 27, an officer conducting a *Terry* stop must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch' of criminal activity."  *See also Alabama v. White*, 496

U.S. 325, 329-30 (1990); *United States v. Howell*, ___ F.4th ___, 2023 WL 4111095, at *3 (4th Cir. June 22, 2023); *Feliciana*, 974 F.3d at 523; *Bumpers*, 705 F.3d at 171; *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2011).

Notably, the suspicion must provide "a *particularized* and objective basis for suspecting *the particular person stopped* of criminal activity. *Wingate v. Fulford*, 987 F.3d 299, 305 (4th Cir. 2021) (emphasis in *Wingate*); *see Cloud*, 994 F.3d at 247. The standard "'depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act.'" *Glover*, 140 S. Ct. at 1188 (citations omitted) (emphasis in *Glover*). Moreover, officers must be permitted to make "'commonsense judgments and inferences about human behavior.'" *Id.* (citation omitted); *see Navarette*, 572 U.S. at 404.

Because the reasonable suspicion standard is an objective one, the officer's subjective state of mind is not considered. *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013); *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011). But, "the detaining officer [must] '. . . either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance.'" *Williams*, 808 F.3d at 246 (citation omitted).

Reasonable, articulable suspicion is determined by examining the totality of the circumstances. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *Sokolow*, 490 U.S. at 7-8; *Gates*, 462 U.S. at 213; *Cortez*, 449 U.S. at 417; *Howell*, 2023 WL 4111095, at *3, *United States v. Griffin*, 589 F.3d 148, 152 (4th Cir. 2009), *cert. denied*, 562 U.S. 1273 (2011). In assessing reasonable suspicion, courts must "give due weight to commonsense judgments reached by officers in light of their experience and training." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004); *see United States v. Sowards*, 690 F.3d 585, 587-88 (4th Cir. 2012); *United States v.*

*Johnson*, 599 F.3d 339, 343 (4th Cir. 2010); *see also United States v. Branch*, 537 F.3d 328, 336-37 (4th Cir. 2008) ("Judicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement."), *cert. denied*, 555 U.S. 1118 (2009).  Notably, if an officer has reasonable suspicion of criminal activity, "he may detain the suspect so as 'to permit the officer to allay the suspicion.'"  *Ortiz*, 669 F.3d at 444 (quoting *United States v. Mason*, 628 F.3d 123, 128 (4th Cir. 2010, *cert. denied*, 565 U.S. 914 (2011).

The question of reasonable, articulable suspicion is sometimes elusive.  The Supreme Court has acknowledged the difficulty in pinpointing exactly what is meant by the term reasonable, articulable suspicion.  *Ornelas*, 517 U.S. at 699-700.  In *Ornelas*, the Court observed, 517 U.S. at 695-96 (citations omitted):

> Articulating precisely what "reasonable suspicion" and "probable cause" mean is not possible.  They are commonsense, nontechnical conceptions that deal with "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  As such, the standards are "not readily, or even usefully, reduced to a neat set of legal rules."

Nevertheless, the reasonable suspicion standard is not onerous.  *See, e.g.*, *Black*, 525 F.3d at 365 (concluding the detective had reasonable suspicion to conduct a *Terry* stop based on factors that included observation of a "bulge which was 6 to 8 inches long along the bottom of the pocket, 1 to 1 ½ inches high, and appeared to have a flat side", and that "the encounter occurred in a high-crime area"); *see also Glover*, 662 F.3d at 698-700.  Notably, it "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," although some "minimal level of objective justification [is required] for making the stop." *Wardlow*, 528 U.S. at 123; *see Glover*, 140 S. Ct. at 1188; *Navarette*, 572 U.S. at 397; *White*, 496

U.S. at 330; *United States v. Lawing*, 703 F.3d 229, 236 (4th Cir. 2012), *cert. denied*, 569 U.S. 940 (2013); *United States v. Christmas*, 222 F.3d 141, 143 (4th Cir. 2000).

The suspect's presence in a high-crime area where a stop is performed may be a relevant consideration in the *Terry* analysis.  Standing alone, however, it is generally not enough to support reasonable, particularized suspicion.  *Wardlow*, 528 U.S. at 124; *Bumpers*, 705 F.3d at 171-72.  In addition, "[a] suspect's suspicious movements can also be taken to suggest that a suspect may have a weapon." *George*, 732 F.3d at 299.  Moreover, "multiple factors may be taken together to create a reasonable suspicion even where each factor, taken alone, would be insufficient." *Id*. at 300.  So, "reasonable suspicion may exist even if each fact standing alone is susceptible to an innocent explanation." *United States v. McCoy*, 513 F.3d 405, 413-14 (4th Cir. 2008) (citing *Arvizu*, 534 U.S. at 277-78).  In other words, the court must evaluate "cumulative information" available to the detaining officer.  *United States v. McBride*, 676 F.3d 385, 392 (4th Cir. 2012).

But, the Fourth Circuit has warned against using "whatever facts are present, no matter how innocent, as indicia of suspicious activity." *Foster*, 634 F.3d at 248.  Moreover, the Fourth Circuit has instructed that "[b]eing a felon in possession is not the default status." *Black*, 707 F.3d at 540.  In Maryland, which allows certain people to carry firearms, "the exercise of this right, without more, cannot justify an investigatory detention.  Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states." *Id.*

S.A. Welsh testified that he knew that Jones's criminal history precluded him from possessing a firearm.  And, he recognized a gun in defendant's front pocket.  In the Court's view, S.A. Welsh's knowledge of defendant's criminal history, coupled with his observations of Jones on that date, via CCTV, readily gave rise to a "reasonable, articulable suspicion that 'criminal activity may be afoot.'" *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020) (quoting

*Terry*, 392 U.S. at 30); *see also United States v. Gist-Davis*, 41 F.4th 259, 265 (4th Cir. 2022) ("Based on the totality of these circumstances, we conclude that the officers had a reasonable, particularized suspicion that [defendant], a convicted felon, was at the fair in possession of a firearm.").

In sum, the BPD may well have had probable cause to arrest the defendant.  At the very least, the BPD had reasonable, articulable suspicion to detain him.

### C. The Warrantless Search of the Satchel

Based on the legal principles outlined earlier, I shall assume that the seizure of the defendant constituted an arrest and that the BPD had probable cause to arrest defendant.  The question remains whether the warrantless search of the satchel was lawful.

The search of the satchel is the central dispute in the case.  Even if Jones was lawfully seized, defendant argues that the BPD officers violated his Fourth Amendment rights when they conducted a warrantless search of his satchel while he was restrained and not in the vicinity of the bag.  ECF 33 at 8-13.  Defendant maintains that, even if the BPD had probable cause to arrest him, the search of his bag was not a lawful search incident to arrest.  *Id.* at 11-13.  Conversely, the government argues that the seizure of defendant constituted an arrest founded on probable cause. And, the government maintains that the search of the satchel was a lawful search incident to arrest.

The parties vigorously disagree about where and when Detective Rodriguez actually conducted a search of the satchel.  In its Opposition, the government states: "While [Rodriguez was] standing a few steps away from Jones, [he] began his search of the cross-body satchel and discovered a firearm."  ECF 38 at 5-6.  However, "[t]he Defense maintains the search happened later, when Officer Rodriguez-Ramos walked even farther away from Mr. Jones, to the back of a patrol car that was parked in the street."  ECF 43 at 1.  Either way, the search was unlawful.

"As a general rule, the Fourth Amendment requires that law enforcement searches be accompanied by a warrant based on probable cause." *United States v. Kolsuz*, 890 F.3d 133, 137 (4th Cir. 2018). Warrantless searches and seizures *i.e.,* those "conducted outside the judicial process," without prior approval by a judge or a magistrate, are *per se* unreasonable, subject only to a few well established exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967); *see also Kentucky v. King*, 563 U.S. 452, 459-60 (2011); *Minnesota v. Dickerson*, 508 U.S. 366, 374 (1993). The government bears the burden of proving, by a preponderance of the evidence, that a valid exception applies. *See Gwinn*, 219 F.3d at 335.

A search incident to arrest constitutes an exception to the warrant requirement, permitting a search of "the arrestee's person and the area 'within his immediate control.'" *Davis v. United States*, 564 U.S. 229, 232 (2011) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). The exception is based on safety considerations and evidentiary justifications. *See Arizona v. Gant*, 556 U.S. 332, 335 (2009). But, there are limitations. For example, in *Gant*, 556 U.S. at 341, the Supreme Court said: "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." (citing *Preston v. United States*, 376 U.S. 364, 367–368 (1964)).

The case of *United States v. Davis*, 997 F.3d 191 (4th Cir. 2021), is instructive. In that case, because of a window tint violation, officers stopped a car driven by the defendant. *Id.* at 193. During the traffic stop, the defendant fled the scene in his car and officers pursued him. *Id*. at 194. The high-speed pursuit continued into a residential neighborhood, where the defendant exited from the vehicle carrying a backpack and ran into a swamp. *Id*. Officers ordered the defendant out of the swamp. *Id*. He complied by leaving the swamp, dropping the backpack, and prostrating

himself on the ground. *Id*. As the defendant laid on his stomach, officers handcuffed the defendant behind his back and searched the backpack. *Id*. Contraband was recovered. *Id*.

The Fourth Circuit concluded that the warrantless search of the backpack was unlawful. *Id*. at 198-99. Applying *Gant*, 556 U.S. 332, the Court stated that "police officers can conduct warrantless searches of non-vehicular containers incident to a lawful arrest only when the arrestee is unsecured and within reaching distance of the [container] at the time of the search.'" *Davis*, 997 F.3d at 197 (quoting *Gant*, 556 U.S. at 343) (alteration in *Davis*)).

As the Fourth Circuit explained, a police officer's "warrantless search of [the defendant's] backpack was only permissible as a search incident to arrest if it was reasonable for [the officer] to believe that [the defendant] could have accessed the backpack at the time of the search." *Davis*, 997 F.3d at 197 (internal quotation marks omitted) (brackets added). The Court observed that the defendant had been ordered out of the swamp at gunpoint; was laying face down; was handcuffed behind his back; the officers "outnumbered him three to one"'; and "no one else [was] around to distract the officers." *Davis*, 997 F.3d at 197. On these facts, it determined that the defendant was "secured and not within reaching distance of his backpack when [the officer] unzipped and searched it."

Further, the Court reasoned, *id*.:

> By the time of the search . . . [defendant] was handcuffed – severely curtailing the distance he could reach. We need not recount the various acrobatic maneuvers [defendant] would have needed to perform to place the backpack within his reaching distance at the time of the search. It is enough to say that, at the moment in question, the handcuffed and face-down [defendant] had severely restrained mobility and was not within reaching distance of the backpack next to him.

In *Davis*, the backpack was "next to" the defendant. *Id*. at 198. But, that fact did not render the search lawful. Here, as in *Davis*, at all relevant times the defendant was handcuffed behind his back. Therefore, it was "not reasonable to believe that [defendant] could have accessed his [bag]

at the time of the search." *Id*. at 199. Additionally, although the area of the search here was an urban one, the scene was calm, with no interference from bystanders. Rather, Jones was essentially "alone" at the time of the search, and police officers significantly "outnumbered him." *Id*. at 200. Indeed, police officers in this case "outnumbered" Jones to an even greater degree than they outnumbered the defendant in *Davis*—by six or seven to one, compared to three to one. *Id*. at 198.

In fact, the only material distinction between this case and *Davis* is that here, Jones was seated and not laying on the ground, face down. Regardless, Jones, like the defendant in *Davis*, was "both secured and not within reaching distance" of his satchel at the time of the search, even assuming that the search occurred when Rodriguez felt the bag as he stood near the defendant. *Id*. Jones, like Mr. Davis, would have had to engage in "acrobatic maneuvers" to grab his satchel. *Id*. at 197.

To support its position, the government cites *United States v. Ferebee*, 957 F.3d 406 (4th Cir. 2020). In that case, while police were conducting a warrantless search of a home, they located a backpack. *Id*. at 410. Ferebee denied ownership of it. *Id*. Police subsequently arrested and handcuffed Ferebee to take him outside, while another officer searched the backpack, which remained inside the house. *Id*. at 410-11. A firearm was discovered. *Id*. at 410. The Fourth Circuit concluded that the search was proper because Ferebee "clearly and unequivocally disavowed ownership of the backpack," and he therefore abandoned any privacy interest in the bag. *Id*. at 417. In addition, the Court noted that although Ferebee was handcuffed, he "still could walk around somewhat freely and could easily have made a break for the backpack." *Id*. at 419. Indeed, the Fourth Circuit observed that even "after Ferebee was handcuffed and led outside," he managed to locate and toss a marijuana joint. *Id*.

The circumstances in this case are significantly different from those in *Ferebee*. Jones, in contrast to the defendant in *Ferebee*, was not "milling about" or able to "walk around somewhat freely." *See Ferebee*, 957 F.3d at 419. Instead, multiple officers—who had approached Jones only moments before with guns drawn—guarded him closely while he sat with his hands behind his back and in handcuffs. Additionally, unlike the defendant in *Ferebee*, Jones did not do anything demonstrating his "wherewithal and dexterity to tamper with evidence while handcuffed." *See Davis*, 997 F.3d at 199 (contrasting the circumstances in *Davis* with those in *Ferebee*).

Moreover, as the government concedes, *Ferebee*'s determination that the defendant was not "secured" is dicta. ECF 38 at 11; *see also Davis*, 997 F.3d at 199 n.7 ("*Ferebee*'s discussion of the application of [the search-incident-to-arrest exception] appears to have been dicta."). In my view, the facts here are more akin to *Davis* than to *Ferebee*. At the time in question, Jones was secured.

In an attempt to avoid the inescapable conclusion that *Davis* applies to the facts of this case, the government asserts that Jones's satchel was akin to an outer layer of clothing, and therefore the search was lawful. ECF 38 at 12. The government cites *United States v. Johnson*, MHL-21-29, 2022 WL 2373700 (E.D. Va. June 30, 2022), to support its position. ECF 41 at 10.

In *Johnson*, the Eastern District of Virginia upheld a search of a cross-body bag that was strapped to the defendant's stomach, concluding that it was a lawful search incident to arrest. *Johnson*, 2022 WL 2373700, at *19. Critically, however, "at the time of the search," the defendant's "bag was resting across his stomach." *Id.* And, because the bag "rested across [defendant's] body" while officers searched it, the court determined that the search was akin to "a search of clothing, such as a sweatshirt with a pocket across the stomach or pants pockets." *Id.*

The *Johnson* Court determined that *Davis* was inapplicable because *Davis* involved the search of a bag from which the defendant was "physically separated" when officers searched it. In contrast, *Johnson* involved the search of a bag that was "physically touching [defendant's] person" at the time of the search. *Id.*

In this case, BPD officers removed the satchel from Jones's body immediately upon seizing him, and prior to searching it. *See* ECF 33-1 at 1. Unlike *Johnson*, Jones's satchel was "not physically touching his person" at the time of the search. *Johnson*, 2022 WL 2373700, at *19. As *Johnson* recognized, *Davis* applies where, as here, a defendant is "physically separated from the searched bag." *Id.*

In *Davis*, the Fourth Circuit recognized that "exceptions to the warrant requirement are *not* police entitlements to searches. Rather, they are narrow exceptions which must be justified by specific circumstances." *Davis*, 997 F.3d at 202-03 (emphasis in original). The specific circumstances of this case—where Jones was secured and unable to access the satchel—cannot justify the application of the narrow search-incident-to-arrest exception.

Jones also maintains that the search-incident-to-arrest exception does not apply because it was the search that justified the arrest—and not the other way around. *See* ECF 41 at 3. As I have said, the seizure of Jones on the porch had the indicia of an arrest. That said, it is clear that the BPD officers did not intend to arrest Jones when they entered the porch of the Residence. Indeed, they told him that he was not under arrest. Their subjective view does not determine the nature of the seizure. But, their view is not necessarily irrelevant as to all issues.

The Fourth Circuit has made clear that "although a search can occur before an arrest is actually made, a search 'may not precede an arrest and serve as part of its justification.'" *United States v. Currence*, 446 F.3d 554, 557 (4th Cir. 2006) (quoting *Sibron*, 392 U.S. at 63). Here, the

search of the satchel led to the recovery of the gun.  At least from the perspective of the BPD officers, the search served as the justification for defendant's arrest.  And, if the officers believed that defendant was not under arrest at the time he was handcuffed, the search-incident-to-arrest exception cannot justify the search.  Even if the seizure amounted to an arrest, based on probable cause, the search-incident-to-arrest exception does not apply if the officer does not "subjectively intend[] to make . . . an arrest."  *People v. Reid*, 24 N.Y.3d 615, 618, 26 N.E. 3d 237, 238 (2014).

In *Reid*, the police had probable cause to arrest the defendant for driving while intoxicated, but they did not decide to arrest him until after they searched him and discovered he was in possession of a weapon.  The Court of Appeals of New York held that the search was not justified as a search incident to arrest because "but for the search there would have been no arrest at all." 24 N.Y. 3d at 619, 26 N.E. 3d at 239.  The court explained: "It is irrelevant that because probable cause existed, there *could* have been an arrest without a search.  A search must be incident to an actual arrest, not just to probable cause that might have led to an arrest, but did not." *Id.* (emphasis in original).

*Reid* relied on the Supreme Court's decision in *Knowles v. Iowa*, 525 U.S. 113 (1998).  In *Knowles*, an officer stopped the defendant for speeding—and had probable cause to arrest him—but chose not to arrest him and instead issued a citation. *Id*. at 114.  The officer then searched the car, found marijuana, and arrested the defendant. *Id*.  The Supreme Court unanimously held that the search was not a lawful search incident to arrest, even though the officer had probable cause to arrest the defendant prior to the search. *Id*. at 119.  As the court in *Reid* explained: "If a search could be justified by an arrest that, but for the search, would never have taken place, the Supreme Court would not have decided *Knowles* in the way it did." *Reid*, 24 N.Y.3d at 620, 26 N.E. 3d at

240.  The point in both *Reid* and *Knowles* "was that the search caused the arrest and not the other way around."  *Id.*

Numerous courts have reached the same conclusion: The search-incident-to-arrest exception does not apply when the arresting officer does not intend to make an arrest prior to the search.  *See, e.g.*, *Sinclair v. State*, 2022 WL 94613, at *8 (Md. Ct. Spec. App. Jan. 10, 2022) ("[T]he search of Appellant cannot be justified as a search incident to arrest where the intent to arrest Appellant did not arise until after discovering a firearm on Appellant's person."); *Floyd v. City of New York*, 959 F. Supp. 2d 540, 649 n.651 (S.D.N.Y. 2013) (declining to hold "that a search can be justified as incident to arrest where the officer has no *intention* of arresting the individual at the time the search is conducted" (emphasis in original)); *State v. Smith*, 155 N.J. 83, 92, 713 A.2d 1033. 1038 (1998) ("[T]he police must have contemporaneous subjective intent to arrest in order to justify a search incident to arrest."); *State v. Taylor*, 167 Ariz. 439, 439 (Ct. App. 1990) ("The issue raised by these facts is whether officers are free to search anyone they might arrest but have no intention of arresting under a search incident to arrest theory. We believe they may not.").

Although the preceding cases did not involve arrests prior to the searches, the analysis does not change.  When Detectives Ramsey and Rodriguez seized defendant on the porch, they declared that Jones was not under arrest.  At that time, Ramsey told defendant, "You're not under arrest; you're just being detained."  *See* ECF 33 at 3.  In his Reply, defendant states that Jones asked the officers why he was stopped, and Ramsey explained that they seized him based on "RAS, reasonable articulable suspicion," and not "probable cause."  ECF 41 at 5.  And, as noted, "drawing weapons, handcuffing a suspect, . . . or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest," particularly when, as here, the "officers reasonably

suspect [ ] that [the detainee is] armed and dangerous." *Elston*, 479 F.3d at 320 (internal quotation marks omitted).

It was only after Rodriguez searched the satchel and recovered the gun that the officers intended to arrest Jones.  Consistent with that belief, only then did Ramsey advise defendant of his *Miranda* rights.  And, only than was Jones searched.

As the facts make clear, the officers believed that the search of defendant's satchel provided the justification for defendant's arrest.  If the search of the satchel "precede[d] an arrest and serve[d] as part of its justification," the search-incident-to-arrest exception does not apply.  *See Currence*, 446 F.3d at 557.

The government also attempts to justify the search of the satchel based on *Terry*'s protective search doctrine (ECF 38 at 14-16) – that is, that a warrantless search during an investigatory stop may be lawful "when an officer 'reasonably . . . conclude[s] in light of his experience' that 'the persons with whom he is dealing may be armed and *presently* dangerous.'" *United States v. Buster*, 26 F.4th 627, 634 (4th Cir. 2022) (quoting *Terry*, 392 U.S. at 30) (emphasis and alterations in original)).  However, the Fourth Circuit has said that *Terry*'s protective search doctrine "cannot be stretched to cover situations where there is no realistic danger to officer safety."  *Buster*, 26 F.4th at 635.  Such a search "must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Dickerson*, 508 U.S. at 373 (quotation marks omitted).

In *Buster*, law enforcement officers responded to a domestic assault involving the discharge of a firearm by the suspect.  *Id*. at 630. The officers conducted a *Terry* stop of the defendant because he matched the description of the suspect and was seen outside the victim's house earlier that evening.  *Id*.  The defendant attempted to flee, but fell to the ground, where officers tackled him.

While the suspect was on the ground, officers handcuffed him and removed a bag that was strapped across his chest. *Id.* After removing the bag, an officer noticed that it was "hard to the touch" and believed it contained a weapon. *Id.* The officer opened the bag while the defendant was handcuffed on the ground and discovered a firearm and a box of ammunition. *Id.*

The circumstances surrounding the search of the bag in *Buster* are strikingly similar to the circumstances at issue here. The *Buster* Court said: "[E]ven assuming the officer had reasonable suspicion that the bag contained a weapon (a point we need not decide), that fact alone could not generate reasonable suspicion that [defendant] was 'presently dangerous' after he was already restrained and no longer had access to the bag." *Id.* at 635 (quoting *Terry*, 392 U.S. at 30).

In particular, the Court noted that because the officer opened the bag when the defendant was restrained and no longer had access to it, the contents of the bag did not present any credible threat to officers' safety at the time of the search, and the warrantless search could not be justified. *Buster,* 26 F.4th at 635. Therefore, the Fourth Circuit ruled that *Terry*'s protective search doctrine did not apply. *Id.* Accordingly, the Court determined that the firearm, found during the unlawful search of the bag, must be suppressed. *Id.*

In reaching this conclusion, the Fourth Circuit noted that the Supreme Court has repeatedly emphasized that "'[t]he purpose of' the 'limited search' authorized by *Terry* 'is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.'" *Id.* at 634 (quoting *Dickerson*, 508 U.S. at 373). The Court made clear that "'a protective search—permitted without a warrant and on the basis of reasonable suspicion less than probable cause—must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" *Buster*, 26 F.4th at 634 (quoting *Dickerson*, 508 U.S. at 373).

As indicated, the government argues that the search occurred when Rodriguez discerned the handle of a firearm while feeling the contents of the satchel. According to the government, *Buster* is inapplicable because, at that time, Jones was within reach of the cross-body satchel. ECF 38 at 15.[8] But, as the Fourth Circuit suggested in *Buster*, the "search" of the bag began when the officer actually opened it, not when the officer felt the bag and determined that it was "hard to the touch, which in the officer's experience indicates a weapon." *Buster*, 26 F.4th at 634. Specifically, the Court said, *id.*: "Although the parties dispute many things about the events of the evening, there is no disagreement about one critical fact: when the officer opened Buster's bag (thus beginning a 'search' of the bag), Buster was handcuffed on the ground and had no access to it."

Thus, *Buster* supports defendant's contention that the search of the satchel occurred when Detective Rodriguez took the satchel to his police car, some fifteen to twenty feet from Jones, and opened it. *See* ECF 33-1 at 2. Regardless, even if the search occurred when Rodriguez felt the bag, while standing near Jones, defendant was not "presently dangerous." He was handcuffed, with his hands behind his back, and surrounded by three BPD officers. *See Buster*, 26 F.4th at 634-35.

The Supreme Court has made clear that a protective search "must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" *Dickerson*, 508 U.S. at 373 (quoting *Terry*, 393 U.S. at 26). If an officer feels, squeezes, or manipulates the suspect's bag in order to determine its content, at a time when there is no threat of harm from the suspect, then the search has exceeded the bounds of a *Terry* pat down and is impermissible. *See Dickerson*, 508 U.S. at 378–79.

---

[8] Again, Jones was within reach of the bag only because Officer Rodriguez chose to stand near Jones while holding the bag.

In *Buster*, as here, "[t]he government offers no explanation for how the contents of the bag presented any credible threat to the officers' safety at the time they searched it, and quickly frisking an unsecured suspect or a bag during a *Terry* stop is simply not the same as methodically searching the contents of a bag to which a suspect no longer has access – particularly where the suspect remained restrained and under the officers' physical control."   26 F.4th at 634; *see United States v. Miles*, 247 F.3d 1009, 1015 (9th Cir. 2001) ("Having already used significant force to secure the scene for safety purposes, the officers cannot leverage the safety rationale into a justification for a full-scale search."); *see also United States v. Leo*, 792 F.3d 742, 749-50 (7th Cir. 2015) (holding that the "warrantless search" of a handcuffed individual "exceeds the bounds of *Terry*" because, at the time of the search, the backpack was in the police officer's "hands and no longer in [defendant]'s possession.  So when" the officer "unzipped and emptied the backpack, it was inconceivable that either [defendant] would have been able to lunge for the bag, unzip it, and grab the gun inside.").

*United States v. Walker*, 615 F.3d 728 (6th Cir. 2010), a case on which the government relies, is not to the contrary.  In that case, the Sixth Circuit approved the *Terry* search of the bag where the armed robbery suspect was not handcuffed, officers did not outnumber him, and officers "by no means had the scene under control or their safety secure."  *Id*. at 733-34.

The circumstances in this case are quite different.  Again, Jones was handcuffed, BPD officers outnumbered defendant, and, as reflected in the Incident Report, "the scene was secured." ECF 33-1 at 1.  Accordingly, Jones posed "no realistic danger" to officer safety.  Although protective searches may be justified when there is a credible threat to safety, they cannot be justified when, as here, the defendant was "separated from the bag and no longer had access to it." *Buster*, 26 F.4th at 635; *see also Dickerson*, 508 U.S. at 378-79.

### D. Inevitable Discovery

The exclusionary rule requires the suppression of evidence that is "obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 232 (2011). Such evidence is regarded as the fruit of unlawful police conduct. *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963) (concluding that evidence derived in violation of the Fourth Amendment is deemed "fruit of the poisonous tree" and is inadmissible); *see United States v. Kimble,* 855 F.3d 604, 610 (4th Cir. 2017); *United States v. Stephens*, 764 F.3d 327, 335 (4th Cir. 2014); *United States v. Doyle*, 650 F.3d 460, 466 (4th Cir. 2011); *see also United States v. Oscar-Torres*, 507 F.3d 224, 227 (4th Cir. 2007) ("Indisputably, suppression of evidence obtained during illegal police conduct provides the usual remedy for Fourth Amendment violations."). However, the government argues that, even if the warrantless search of defendant's satchel was unreasonable, the inevitable discovery doctrine precludes suppression of the evidence because the firearm would have been discovered during a required inventory search. ECF 38 at 16-18.

The doctrine of inevitable discovery permits the introduction of improperly seized evidence "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017); *United States v. Whitehorn*, 813 F.2d 646, 650 (4th Cir. 1987). According to the government, the BPD would have found the weapon during a required and lawful inventory search.

"'Lawful means' include searches that fall into an exception to the warrant requirement, 'such as an inventory search[] that would have inevitably uncovered the evidence in question.'" *United States v. Seay*, 944 F.3d 220, 223 (4th Cir. 2019) (citation omitted) (brackets in *Seay*). Notably, "the premise of the inevitable discovery doctrine is that the illegal search played no real

part in discovery of incriminating evidence.  Only then, if it can be shown that the taint did not extend to the second search, would the product of the second search be admissible." *Whitehorn*, 813 F.2d at 650 n.4.

"For the inventory exception to apply, the search must have 'be[en] conducted according to standardized criteria,' such as a uniform police department policy, and performed in good faith." *United States v. Matthews*, 591 F.3d 230, 235 (4th Cir. 2009) (quoting *Colorado v. Bertine*, 479 U.S. 367, 374 n. 6, (1987) (alterations in *Matthews*); *see Buster*, 26 F.4th at 633-34.  The purpose of the inventory search is to secure items in lawful police custody, not to gather incriminating evidence.  *United States v. Treisman*, 71 F.4th 225, 234 (4th Cir. 2023).

In *Seay*, 944 F.3d 220, the Fourth Circuit upheld the warrantless search of a suspect's bag as a lawful inventory search.  In that case, officers responded to a hotel to evict a difficult customer, Devin Bracey.  *Id*. at 221.  After officers knocked on the door, Bracey opened the door and officers informed him and the defendant that they had to leave. *Id*.  The defendant and Bracey gathered their belongings and left the room.  *Id*.  Soon after, officers searched the room and found drug paraphernalia in women's underwear and ammunition in the toilet and ordered the defendant and Bracey back to the room.  *Id*.  Officers discussed the possibility of arresting the defendant for possession of ammunition as a prohibited person but decided to interview him and Bracey first. *Id*.

After interviewing the couple, officers developed probable cause to arrest Bracey.  *Id*. Officers wanted to determine which property was whose before they searched Bracey prior to taking her to the lockup.  *Id*. at 222.  As officers searched Bracey's belongings, an officer asked her who owned the plastic bag and she responded, "this is our stuff."  *Id*.  Officers searched the bag and found a silver handgun.  *Id*.  Thereafter, the defendant was indicted on one count of

possession of a firearm as a prohibited person and he moved to suppress the firearm. The district court ruled that the search of the plastic bag was not a lawful search incident to arrest but denied the defendant's motion to suppress, concluding that officers inevitably would have discovered the evidence by lawful means. *Id.*

The Fourth Circuit upheld the lawfulness of the inventory search. *Id.* at 223. The officers testified that it was police department procedure "to inventory an arrestee's belongings before taking her to jail." *Id.* Of relevance here, the Court indicated that the officers' testimony explaining the inventory procedure was sufficient and the government was not required to provide a written inventory policy. *Id.* (citing *Bullette*, 854 F.3d at 266).

In my view, the testimony presented by the government as to a standardized BPD procedure was woefully confusing and deficient. If the BPD has a policy in place with regard to inventory searches, the police witnesses hardly made it clear.

In any event, the government cannot meet its burden because it was not "inevitable" that Jones would have been arrested. Indeed, in the view of the BPD, defendant was only arrested after officers searched his bag and found the gun. In *Seay*, prior to the challenged search, the police officers had probable cause to arrest the defendant's companion based on an earlier search of the hotel room, and the officers would have inventoried the companion's belongings pursuant to standard procedures. *Seay*, 944 F.3d at 220. In contrast, BPD officers told Jones multiple times that he was not under arrest, and that he was being detained based on reasonable suspicion. It was only after the search of the satchel that BPD determined to arrest the defendant. So, in the absence of that arrest, no inventory would have been conducted. It follows that the inventory search was not inevitable.

Courts have rejected the application of the inevitable discovery doctrine under a variety of circumstances.  In *United States v. Jenkins*, 876 F.2d 1085 (2d Cir. 1989), for example, the court explained that "before an inventory search is permissible, the government must have legitimate custody of the property to be inventoried, either as a result of lawful arrest . . . or by some other method." (citing *Illinois v. Lafayette*, 462 U.S. 640, 644 (1983)).  Because police arrested the defendant for a crime "he had not yet committed," the arrest was illegal and "no valid inventory search could have been based on that arrest."  *Jenkins*, 876 F.2d at 1089; *cf. United States v. Infante-Ruiz*, 13 F.3d 498, 503 (1st Cir. 1994) (rejecting the inevitable discovery doctrine where the government could not show "that the officers could have taken 'legitimate custody' of the vehicle but for discovery of the" contraband.)

Furthermore, the inventory exception is not available to police who act "in bad faith or for the sole purpose of investigation."  *Colorado v. Bertine*, 479 U.S. 367, 372 (1987); *see also, e.g.*, *United States v. Banks*, 482 F.3d 733, 741 (4th Cir. 2007) (explaining that an inventory search is not lawful where "the purpose of the inventory" of property is "to gather incriminating evidence against the owner").  As the Supreme Court has said, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence."  *Florida v. Wells*, 495 U.S. 1, 4 (1990).  Therefore, the government "may not raise the inventory-search banner in an after-the-fact attempt to justify what was purely and simply a search for incriminating evidence."  *United States v. Ball*, 804 F.3d 1238, 1241 (8th Cir. 2015); *see also, e.g.*, *United States v. Monclavo-Cruz*, 662 F.2d 1285, 1289 (9th Cir. 1981) (ruling the search of a purse did not qualify as an inventory search where the officer "clearly had an investigatory purpose"); *United States v. Johnson*, TDC-16-135, 2017 WL 2256599, at *10 (D. Md. May 22, 2017) (concluding that the search of a vehicle was not a valid inventory search because of "indicia that the search was aimed at gathering

evidence," including that the officer searched the car before issuing a citation, began the search without explaining the search was for the "sole purpose" of documenting its contents, was not prepared to document the contents of the vehicle, and only documented the incriminating items found in the car).

The purpose of the search here was to look for the gun that officers believed was in the satchel.  Rodriguez searched the satchel because he expected to find incriminating evidence in the bag.  *Cf. Banks*, 482 F.3d at 741 (upholding the search of bags where the defendant "presented no evidence that [the detective] initiated the search of the bags . . . because he suspected that he would find incriminating evidence therein").   Accordingly, the handgun would not have been inevitably discovered during an inventory search, as officers would not have arrested defendant without the search.

The officers should have secured the satchel and then they should have obtained a warrant before searching it.  Having failed to do so, the evidence seized during the warrantless search must be suppressed.

### E. The Warrantless Entry onto the Porch

Defendant contends that the BPD officers' warrantless entry onto the Residence presents another independent ground that supports suppression of the evidence.  ECF 33 at 14-20.  In its Opposition, the government contends that defendant does not have standing to challenge the search of the Residence.  ECF 38 at 18-20.  But, even if defendant does have standing, the government maintains that the warrantless entry was justified by exigent circumstances.  *Id*. at 20-22.

I shall assume, *arguendo*, that the warrantless search of the satchel was a search incident to arrest.  Therefore, I will next address whether the BPD's entry onto the porch of the Residence nonetheless violated defendant's Fourth Amendment rights.

The Supreme Court has made clear that the Fourth Amendment's protection extends to a home's curtilage.  *See Oliver v. United States*, 466 U.S. 170, 180 (1984).  Put simply, the curtilage is "'part of the home itself for Fourth Amendment purposes.'"  *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Oliver*, 466 U.S. at 180).  And, "[t]he front porch is the classic exemplar of an area adjacent to the home and to which the activity of home life extends."  *Jardines*, 569 U.S. at 7 (internal quotation marks omitted).  Therefore, the "front porch" qualifies as "curtilage."  *Id.*  As a result, when law enforcement officers "physically intrude[] on the curtilage to gather evidence," their actions are "presumptively unreasonable absent a warrant."  *Collins v. Virginia*, ___ U.S. ___, 138 S. Ct. 1663, 1670 (2018).

However, "[i]n order to challenge a search under the Fourth Amendment, a defendant bears the burden of proving that he had a legitimate expectation of privacy in the invaded place."  *United States v. Bullard*, 645 F.3d 237, 242 (4th Cir. 2011); *see also United States v. Rusher*, 966 F.2d 868, 873-74 (4th Cir. 1992).  Courts sometimes refer to this question under the rubric of "standing."  *United States v. Castellanos*, 716 F.3d 828, 832 n.3 (4th Cir. 2013).  And, "[f]or an expectation of privacy to be legitimate, it must be objectively reasonable; in other words, it must be an expectation that society is prepared to recognize as reasonable."  *Bullard*, 645 F.3d at 242.

Defendant did not reside at the Residence.  He was supposedly there to visit his friend, Laberia Henderson, the niece of the owner.  She was herself a visitor at the Residence.  CCTV footage recorded defendant socializing with Ms. Henderson on the front porch of the Residence.

The government asserts: "Jones's primary justification for asserting social guest status is his acquaintanceship with the owner's niece, who no longer resides at the residence."  ECF 38 at 20.  However, defendant maintains that, "[e]ven after the niece moved out, she visited her aunt

regularly at the home and continued to have her aunt's permission to invite friends to the residence." ECF 41 at 17.

"[A] person may have a legitimate expectation of privacy in the house of someone else." *United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007); *see also Bonner v. Anderson*, 81 F.3d 472, 475 (4th Cir. 1996) (allowing the plaintiff in that case to assert a Fourth Amendment right in her 42 U.S.C. § 1983 action based on being a "frequent visitor," but not an overnight guest, at the home). In *Gray*, 491 F.3d 138, the Fourth Circuit repeatedly distinguished between social guests and business guests, strongly suggesting that the former, but not the latter, generally enjoy standing to challenge a search under the Fourth Amendment.

For example, *Gray* cited *United States v. Rhiger*, 315 F.3d 1283, 1286 (10th Cir. 2003), for the proposition that the Supreme Court in *Minnesota v. Carter*, 525 U.S. 83 (1998), created "a clear distinction between the status of individuals present at a residence for social purposes and those present for business or commercial matters." *Gray*, 491 F.3d at 145. *Gray* went on to reason that the "distinction between social guests and business visitors arises from several considerations." *Id.* In particular, the *Gray* Court said that "[t]he distinction between business and social guests . . . draws upon the fact that a social host often shares not only his home but also his privacy with his guest," and "social guests entrust their hosts with the safety and security of both their persons and their belongings." *Id.* at 146. *Gray* explained that "[t]he same generally cannot be said of business visitors," who are "[o]ften strangers with little or no connection to a residence." *Id.*

In sum, Ms. Henderson testified that defendant was present at the Residence with the permission of her aunt, who owns the Residence. In effect, Jones was a guest of a guest. The government's claim that the Residence was a drug stash house is conclusory, and insufficient to

defeat defendant's status as a social guest.  The unrefuted testimony of Ms. Henderson, discussed earlier in more detail, is sufficient to establish defendant's standing.

The government contends that, even if defendant has standing to challenge the search of the Residence, no warrant was required because the entry was lawful under the exigent circumstances doctrine.  ECF 38 at 20-22.  In particular, the government claims that the exigent circumstances exception applies because officers believed defendant was a prohibited person in possession of a firearm.  *Id*. at 21.

Under the exigent circumstances exception to the warrant requirement, police "may enter the home if the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment."  *United States v. Taylor*, 624 F.3d 626, 631 (4th Cir. 2010).  To determine whether exigent circumstances justified an officer's actions, a court must examine "the totality of the circumstances confronting the officer as he decides to make a warrantless entry."  *Lange v. California*, 141 S. Ct. 2011, 2018 (2021) (quoting *Missouri v. McNeely*, 569 U.S. 141, 143 (2013)).  "The rationale underpinning the exigent circumstances doctrine is that when faced with an immediate and credible threat or danger, it is inherently reasonable to permit police to act without a warrant."  *United States v. Yengel*, 711 F.3d 392, 396 (4th Cir. 2013).  However, this exception is "narrow," *id.*, and applies only in "exceptional situations."  *Yanez-Marquez v. Lynch*, 789 F.3d 434, 464 (4th Cir. 2015).

In determining whether an exigency reasonably justifies a warrantless search, the Fourth Circuit examines five factors: (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating

the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband. *United States v. Turner*, 650 F.2d 526, 528 (4th Cir. 1981).

The Fourth Circuit's opinion in *Yengel*, 711 F.3d 392, demonstrates that the mere presence of firearms does not amount to an exigency. In *Yengel*, police responded to a domestic dispute after learning that the husband "was potentially armed and threatening to shoot law enforcement personnel." *Id.* at 394. The officers managed to persuade the husband to exit the home, but he remained "extremely upset" and "agitated and emotional." *Id.* While officers were at the residence, they learned that the husband "kept a large number of firearms and a 'grenade' inside the house." *Id.* The house was subsequently searched. *Id.* Notwithstanding the presence of guns and the possible threat of a grenade, the Court held that exigent circumstances did not exist for the search. *Id.* at 400. In particular, the Fourth Circuit determined that the situation lacked exigency because of, *inter alia*, the secured, inaccessible location of the grenade and the fact that no officers on the scene sought to evacuate the area. *See id.* at 398-99; *accord Morgan v. Fairfield Cty.*, 903 F.3d 553, 562 (6th Cir. 2018) ("[T]he mere presence of firearms does not create exigent circumstances.").

Applying the five factors addressed in *Turner* to the facts in this case leads to the conclusion that no exigency existed for the warrantless entry onto the porch.

First, any claim of urgency appears pretextual. Notably, S.A. Welsh observed defendant with a firearm one day earlier, yet the BPD did not arrest defendant. Additionally, there was no indication that defendant intended to use the handgun. And, as the defense notes, "[d]uring Special Agent Welsh's extensive monitoring of Mr. Jones on CCTV, he never observed Mr. Jones brandishing a firearm or even getting into a disagreement with another person." ECF 41 at 19-20.

Second, there was no information indicating that Jones knew police were on his trail. So, he would not have had a reason to flee or dispose of the weapon. Moreover, a firearm can be discarded, but it is not easily destructible. *Cf. King*, 563 U.S. at 461 ("Destruction of evidence issues probably occur most frequently in drug cases because drugs may be easily destroyed by flushing them down a toilet or rinsing them down a drain."); *see also, e.g.*, *United States v. Miller*, MGL-21-294, 2022 WL 10067537, at *4 (D.S.C. Oct. 17, 2022) (applying the *Turner* factors and determining the exigent circumstances exception was inapplicable because "the suspected contraband, a firearm, was not readily destructible. Therefore, the officers had time to obtain a warrant and return to conduct the search."); *Scott v. City of Mount Vernon*, KMK-14-4441, 2017 WL 1194490, at *12 (S.D.N.Y. Mar. 30, 2017) ("[T]he destruction of evidence exception applies most naturally to those circumstances where narcotics or some other easily destructible piece of evidence is at issue, in contrast to the firearms that officers perhaps hoped they would find here.").

Third, defendant presented no abnormal threat to the police officers. As the Fourth Circuit has recognized, "[i]nevitably, every police interaction with the public will carry with it an apprehension of the unknown; but not every interaction presents an emergency requiring preventive action." *Yengel*, 711 F.3d at 400.

Accordingly, the exigent circumstances exception to the warrant requirement is inapplicable.

### IV. Motion to Suppress Statements

In defendant's Motion to Suppress Statements, Jones asserts that he was subjected to a custodial interrogation prior to receiving a *Miranda* advisement (ECF 34 at 1), and that, even after Jones received his *Miranda* warnings, his statements were not voluntary. *Id*. at 1-2. Jones also

alleges that his statements to officers were the direct result of the earlier alleged Fourth Amendment violation. *Id*. at 2.

The statements in issue have not been clearly identified. And, it is not apparent that defendant was questioned by BPD officers in any meaningful way. But, to the extent that BPD obtained incriminating statements from defendant, suppression is appropriate.

The Fifth Amendment provides, in part: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 498 (1966), the Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege against self-incrimination, applicable when that defendant is subject to custodial interrogation. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) (reaffirming *Miranda* as "a constitutional rule"). "Before conducting a custodial interrogation of a suspect, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, and that he has the right to an attorney during questioning." *United States v. Wilder*, 304 F. Supp. 3d 464, 469 (D. Md. 2018); *see Berkemer v. McCarty*, 468 U.S. 420, 429 (1984); *United States v. Parker*, 262 F.3d 415 (4th Cir. 2001). The government bears the burden of establishing, by a preponderance of the evidence, that defendant was advised of his rights and that his statements were made voluntarily. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986). Unless a defendant in custody is advised of his rights and voluntarily waives them, his statements during custodial interrogation must be suppressed. *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017).

"The four warnings *Miranda* requires are invariable. . . ." *Florida v. Powell*, 559 U.S. 50, 60 (2010). The Fourth Circuit "has rejected attempts to add additional warnings to the time-tested *Miranda* formulation." *United States v. Clenney*, 631 F.3d 658, 668 (4th Cir. 2011); *see Harris v.*

*Riddle*, 551 F.2d 936, 938-39 (4th Cir. 1977).  The warnings may be oral or written.  *United States v. Dire*, 680 F.3d 446, 474 (4th Cir. 2012), *cert. denied*, 568 U.S. 1145 (2013).  Moreover, there is no "'precise formulation of the warnings'" needed to satisfy *Miranda's* "'strictures.'"  *Id.* (citation omitted).  However, absent *Miranda* warnings and a voluntary waiver, statements made during custodial interrogation are generally inadmissible.  *United States v. Hargrove*, 625 F.3d 170, 177 (4th Cir. 2010), *cert. denied*, 565 U.S. 899 (2011).

It is pellucid that the application of *Miranda* is triggered only in a custodial setting. *Miranda*, 384 U.S. at 441, 444; *see Yarborough v. Alvarado*, 541 U.S. 652, 660 (2004).  The Supreme Court has observed: "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime."  *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam).  But, the police must only provide the suspect with *Miranda* warnings if there is a custodial interrogation.  *Id.*  (holding law enforcement officials are not required to administer *Miranda* warnings to everyone they question).

The threshold question, then, is whether the defendant was in custody.  If he was not in custody, there is no *Miranda* issue.  "The *Miranda* custody inquiry is an objective test." *Yarborough*, 541 U.S. at 667; *see J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011); *United States v. Hashime,* 734 F.3d 278, 285 (4th Cir. 2013).  "When determining whether an interrogation is custodial for purposes of *Miranda*, 'a court asks whether, under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest.'"  *United States v. Azua-Rinconada*, 914 F.3d 319, 325-26 (4th Cir. 2019) (citing *Hashime*, 734 F.3d at 282) (internal quotations, brackets, citation omitted).  The inquiry "asks whether a reasonable person

would have felt he or she was not at liberty to terminate the interrogation and leave." *Hashime*, 734 F.3d at 282-83.

For purposes of the Fifth Amendment, the concept of "custody" does not necessarily require a formal arrest.  "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam); *see Oregon v. Mathiason*, 429 U.S. 492, 495 (1997); *Hashime*, 734 F.3d at 282; *United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010), *cert. denied*, 565 U.S. 899 (2011).  Put another way, "'custodial interrogation'" means "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Yarborough,* 541 U.S. at 661 (quoting *Miranda*, 384 U.S. at 444).

Statements obtained from a defendant during custodial interrogation are inadmissible in the government's case-in-chief unless the government can prove, by a preponderance of evidence, that law enforcement officers adequately informed the defendant of his *Miranda* rights and obtained a knowing and voluntary waiver of those rights.  *See Miranda*, 384 U.S. at 476-79; *see also Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010); *Dickerson*, 530 U.S. at 444; *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Berkemer*, 468 U.S. at 429; *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *United States v. Cardwell*, 433 F.3d 378, 389 (4th Cir. 2005); *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002).

Further, "[t]he mere passage of time . . . does not compromise a *Miranda* warning.  Courts have consistently upheld the integrity of *Miranda* warnings even in cases where 'several hours' have elapsed between the reading of the warning and the interrogation." *United States v. Frankson*,

83 F.3d 79 (4th Cir. 1996) (citation omitted) (upholding interrogation where two and a half hours elapsed between warnings and interrogation).

The inquiry into whether an individual has waived his *Miranda* rights has "two distinct dimensions." *Burbine*, 475 U.S. at 421; *see Edwards v. Arizona*, 451 U.S. 477, 482 (1981); *Cristobal*, 293 F.3d at 139.  As the Supreme Court explained in *Burbine*, 475 U.S. at 421, the government must first show that the waiver was "voluntary," *i.e.*, "that it was the product of free and deliberate choice rather than intimidation, coercion, or deception."  Second, it must prove that the waiver was made knowingly, meaning that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Id.*; *see also Tague v. Louisiana*, 444 U.S. 469, 470 (1980); *Butler*, 441 U.S. at 373.

The Fourth Circuit has said that "[t]he test for determining whether a statement is involuntary under the Due Process Clause is whether the defendant's will has been overborne or his capacity for self-determination critically impaired because of coercive police conduct." *Cristobal*, 293 F.3d at 140 (internal quotation marks and citations omitted).  "To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation."  *Id.* (internal quotation marks omitted).

A statement that follows *Miranda* warnings will "[r]arely" be deemed involuntary. *Dickerson*, 530 U.S. at 444.  However, mere voluntariness of a waiver is not enough.  A waiver must also be knowing and intelligent.  *Cristobal*, 293 F.3d at 142.

As the *Burbine* Court explained, 475 U.S. at 421, "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite

level of comprehension may a court properly conclude that the *Miranda* rights have been waived."
(Citation omitted).  To be a knowing and intelligent waiver, "'the waiver must have been made
with a full awareness of both the nature of the right being abandoned and the consequences of the
decision to abandon it.'"  *Cristobal*, 293 F.3d at 140 (quoting *Burbine*, 475 U.S. at 421).

A waiver of rights may be express, either orally or in writing, or it may be implied from a
defendant's actions and words.  *Berghuis*, 560 U.S. at 384; *Cardwell*, 433 F.3d at 389.  In *Berghuis*,
560 U.S. at 387, the Court recognized that a court may "infer a waiver of *Miranda* rights 'from the
actions and words of the person interrogated.'"  (Quoting *Butler*, 441 U.S. at 373).  The court must
consider all of the circumstances to determine if there is a waiver, express or implied.  *Berghuis*,
560 U.S. at 389.  Moreover, the *Berghuis* Court recognized, 560 U.S. at 385, that *Miranda* "does
not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights."

The *Berghuis* Court has said, *id.*:  "As a general proposition, the law can presume that an
individual who, with a full understanding of his or her rights, acts in a manner inconsistent with
their exercise has made a deliberate choice to relinquish the protection those rights afford."  The
Court stated, *id.* at 388-89:  "[A] suspect who has received and understood the *Miranda* warnings,
and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced
statement to the police."

"[T]he controlling burden of proof at suppression hearings should impose no greater
burden than proof by a preponderance of the evidence."  *United States v. Matlock*, 415 U.S. 164,
177 n.14 (1974); *see Colorado*, 479 U.S. at 168-69 ("Whenever the State bears the burden of proof
in a motion to suppress a statement that the defendant claims was obtained in violation of our
*Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence."); *United
States v. Robinson*, 404 F.3d 850, 860 (4th Cir. 2005).

It is clear that defendant was advised of his *Miranda* rights by Detective Ramsey. There is no indication of improper coercion or duress. Nor does it appear that defendant was impaired and thus unable to comprehend the advisement. And, at least until defendant was being transported to the police station, he appeared calm and alert.

Nevertheless, "a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint." *Taylor v. Alabama*, 457 U.S. 687, 690 (1982) (internal citation omitted). Here, any incriminating statements made by Jones were the result of an unlawful search. Additionally, there was no "intervening event . . . to purge the primary taint." *Id*. To the extent that the defendant made any incriminating statements, they must be suppressed as fruit of the poisonous tree. *Wong Sun,* 371 U.S. at 484.

## V. Conclusion

I agree with the parties that the seizure of Jones on the porch constituted an arrest. I am also satisfied that it was founded on probable cause. In the alternative, it was a detention that was certainly supported by reasonable, articulable suspicion.

Regarding the warrantless search of the satchel, I agree with the defendant that the search occurred at the police vehicle, some fifteen to twenty feet from defendant, when the gun was uncovered. At that time, defendant had no access to the satchel. But, even if the search of the satchel occurred when Rodriguez felt the bag while standing near the defendant, as the government contends, such a search was not a lawful search incident to arrest, nor was it within the scope of *Terry*'s protective search doctrine. This is because the search was conducted while defendant was restrained, secured, unable to access the satchel, and not presently dangerous.

Additionally, I cannot conclude that the handgun would have been inevitably discovered during a lawful inventory search.  For one thing, the evidence as to BPD's inventory policy was entirely murky.  In addition, the officers at the scene believed that an arrest was effectuated only after the search.  The ends cannot justify the means.

Alternatively, the BPD officers made a warrantless entry onto the porch of the Residence, where defendant was a social guest.  Therefore, he has standing to challenge the entry.  The porch constitutes curtilage, protected by the Fourth Amendment.  And, because BPD made the warrantless entry, without exigent circumstances, the entry was unlawful.

The warrant requirement of the Fourth Amendment applies here; the BPD officers should have sought a warrant to search the satchel.  Any statements that defendant may have made after the unlawful search of the satchel are the fruit of unlawful police conduct.

For the reasons set forth above, I shall grant defendant's motions.  ECF 33; ECF 34.  An Order follows, consistent with this Memorandum Opinion.


Date:  July 18, 2023                                  _____/s/_____
                                                      Ellen L. Hollander
                                                      United States District Judge